UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

15 CV 4867

---

SECURITIES AND EXCHANGE COMMISSION,

                      Plaintiff,

    - against -

HAIJIAN LUO

                      Defendant.

ECF CASE

MEMORANDUM OF LAW IN
SUPPORT OF *EX PARTE*
EMERGENCY APPLICATION
FOR AN ORDER TO SHOW
CAUSE, FOR AN ASSET
FREEZE, AND OTHER RELIEF

---

Plaintiff Securities and Exchange Commission (the "Commission") respectfully submits this Memorandum of Law in support of its *ex parte* emergency application for an order to show cause, asset freeze and other relief against Defendant Haijian Luo ("Luo" or "Defendant").

**Preliminary Statement**

This is an insider trading case involving suspicious and highly profitable trading by Defendant Luo in the securities of Qihoo 360 Technology Co., Ltd. ("Qihoo" or "the Company") prior to a June 17, 2015 announcement that the Chairman and CEO of the Company and several other entities had offered to purchase all of the outstanding shares of the Company ("the buyout offer"). On June 16, the stock price of Qihoo closed at $66.05. Following the announcement of the buyout offer, Qihoo's stock price opened at $72.08, nearly 10% higher than the previous day's closing price, and rose to $72.65 before closing at $70.15. Defendant is a Chinese national who traded through a U.S. brokerage account, whose remarkably timed purchase of Qihoo out-of-the-money call options resulted in realized profits of approximately $1,019,537.

The declaration and exhibits submitted with this application demonstrate that there is strong circumstantial evidence of insider trading. Luo opened his brokerage account in March 2015 and the only trading activity in this account was the May 19 purchase of 2,250 speculative, short-term, out-of-the-money call options in Qihoo for a total amount of $711,778 – an amount well in excess of his annual salary.

Because Defendant is located overseas, there is serious risk that Defendant will soon transfer the proceeds of his recent Qihoo trades outside of the jurisdiction of the United States courts. Indeed, the Defendant has recently requested that $600,000 be wired from his account to an account in Singapore. The Commission, therefore, seeks an emergency asset freeze and related relief to preserve the *status quo* and to protect this Court's ability to enter a meaningful judgment of disgorgement, prejudgment interest and monetary penalties in this action.

Accordingly, the Commission respectfully requests that the Court enter an order:

(1) Directing Defendant to show cause why an order should not be entered, pending a final disposition of this action:

    (a) Freezing Defendant's assets in the account in which the trading described in the Commission's Complaint occurred; and

    (b) Prohibiting Defendant from destroying records that relate to the allegations in the Complaint or to Defendant's assets, finances or business operations; and

(2) Pending a hearing and adjudication of the foregoing,

    (a) Freezing Defendant's assets in the account in which the trading described in the Commission's Complaint occurred;

(b)  Prohibiting Defendant from destroying records that relate to the allegations in the Complaint or to Defendant's assets, finances or business operations; and

(c)  Authorizing expedited discovery and service by alternate means.

## FACTUAL BACKGROUND

### I. THE DEFENDANT

**Haijian Luo,** age 33, is a citizen of the People's Republic of China and resident of Guangzhou, China. (Declaration of Kathy Murdocco, dated June 23, 2015 ("Murdocco Decl"), at ¶ 14). Luo is the CEO of 4399 Co., Ltd., an online game company that provides single, multiplayer, and children's games as well as animation through the internet. (Murdocco Decl. at ¶ 15).

### II. THE RELEVANT COMPANY AND SECURITIES

Qihoo is a Cayman Islands entity with its principal executive office in Beijing, China. (Murdocco Decl. at ¶ 9). On June 9, 2005, the Company was incorporated in the Cayman Islands as an exempted limited liability company. The Company conducts business through its wholly-owned subsidiaries and affiliated entities, including Qizhi Software, Tianjin Qisi Techonology Co., Ltd., and Qifei Xiangyi. Qihoo is a leading internet company in China. As of June 2014, the Company reported approximately 500 million active PC users and over 640 million mobile users. The Company claims to be the No. 1 provider of internet and mobile security products and the No. 2 PC search provider in China. On March 30, 2011, Qihoo listed its American Depository Shares (ADS) on the New York Stock Exchange ("NYSE"). Qihoo's ADS trade under the symbol QIHU. (Murdocco Decl. at ¶ 10).

### III.  QUIHOO'S JUNE 17 ANNOUNCEMENT

On June 17, 2015,[1] Qihoo issued a press release announcing that "its board of directors (the "Board") has received a preliminary non-binding proposal letter, dated June 17, 2015, from Mr. Hongyi Zhou, chairman and chief executive officer of the Company, CITIC Securities Co. Ltd. or its affiliates, Golden Brick Capital Private Equity Fund I L.P., China Renaissance Holdings Limited or its affiliates and Sequoia Capital China I, L.P. and/or its affiliates, to acquire all of the outstanding Class A and Class B ordinary shares of the Company not owned by them or their affiliates, including Class A ordinary shares represented by American depositary shares (the "ADSs", each two representing three Class A ordinary shares), for $51.33 in cash per Class A or Class B ordinary share, or $77.00 in cash per ADS." (Murdocco Decl. at ¶ 11 and Ex. 1 attached thereto).

The news of the buyout was received positively by the market. Qihoo's ADS shares had closed on the NYSE on June 16 at $66.05. (Murdocco Decl. at ¶ 12). The press release concerning the buyout was issued while the market was closed in the United States. At the start of trading on Wednesday June 17, 2015, Qihoo shares opened at $72.08 and rose to $72.65 before closing at $70.15. *Id.* Commenting on this activity, thestreet.com stated in a headline: "Qihoo 360 Technology Stock Soaring on Acquisition Offer."[2]

### IV.  LUO'S TRADING IN QIHOO OPTIONS

Luo opened an account with the San Francisco office of Credit Suisse on March 6, 2015. In his account opening application, Luo represented that he was the CEO of 4399 Co., Ltd. and had an annual income of $200,001 to $500,000, a net worth of $10,000,001 to $25,000,000, and liquid assets of $5,000,00 to $10,000,000. (Murdocco Decl. at ¶ 21 and Ex. 4 attached thereto).

---

[1] The press release was issued in China on June 17. Because of the time difference between China and the United States, the markets in the United States had not yet opened.
[2] http://www.thestreet.com/story/13189738/1/qihoo-360-technology-qihu-stock-soaring-on-acquisition-offer.html

The only securities trading that took place in Luo's Credit Suisse account prior to the announcement of the buyout offer was the unsolicited purchase of QIHU call options. (Murdocco Decl. at ¶ 22). A **call option** is a contract that gives the buyer the right to buy shares of an underlying stock at the strike price (discussed below) for a specified period of time. On May 19, 2015, Luo purchased 2,250 call options for a total amount of $711,778. (Murdocco Decl. at ¶¶ 23-24).

The call options that Luo purchased were "out of the money." This means that the actual stock price on the date when Luo purchased the options was lower than the strike price at which the options could be exercised. When Luo purchased the call options on May 19, 2015, the underlying security was trading in a range of $57.97 (low) to $59.89 (high) and closed at $58.76. The call options that Luo purchased had strike prices ranging from $60.05 to $65.00. (Murdocco Decl. at ¶ 24). Moreover, the call options that Luo purchased were relatively short term: 800 of the options that he purchased had expiration dates of June 19, 2015; 1,250 of the options that he purchased had expiration dates of July 17, 2015; and 200 of the options that he purchased had expiration dates of September 18, 2015. *Id.* These short-term, out of the money call options were highly speculative and represented a very optimistic view of the company.

Following the announcement of the buyout offer, Luo's options were worth $1,743,500, representing unrealized gains of $1,032,875. Between June 18-19, Luo sold his options, resulting in a realized profit of approximately $1,019,537. (Murdocco Decl. at ¶ 27).

Luo, as the CEO of a Chinese internet gaming company, would naturally have had relationships with individuals at Qihoo one of the largest internet companies in China, which is also highly involved in the online video game business. Indeed, Luo presented at conferences with individual(s) from Qihoo.

## ARGUMENT

I. **THE COURT SHOULD ORDER THAT DEFENDANT'S ASSETS BE FROZEN PENDING A FINAL ADJUDICATION OF THIS ACTION AND PENDING A SHOW CAUSE HEARING AND DETERMINATION OF THE COMMISSION'S APPLICATION.**

    A.    <u>The Burden for the SEC to Obtain an Asset Freeze is Not Onerous.</u>

In this emergency action, the Commission seeks an immediate asset freeze. Such relief turns, in part, on the showing of at least an inference that Defendant has violated the securities laws. See, e.g., Smith v. SEC, 653 F.3d 121, 128 (2d Cir. 2011); SEC v. Cavanagh, 155 F.3d 129, 132, 135 (2d Cir. 1998). "An asset freeze is a provisional remedy, the purpose of which is to ensure that, in the event the SEC obtains a judgment, money will be available to satisfy that judgment." SEC v. Byers, No. 08 Civ. 7104 (DC), 2009 WL 33434, at *2 (S.D.N.Y. Jan. 7, 2009). To obtain an asset freeze, the Commission "must show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws." Smith, 653 F.3d at 128. As emphasized by the Second Circuit in SEC v. Unifund SAL, 910 F.2d 1028, 1041 (2d Cir. 1990), "the Commission should be able to preserve its opportunity to collect funds that may yet be ordered disgorged." This is a lesser showing than is required to obtain a preliminary injunction against future violations of the securities laws. Id.; see also Byers, 2009 WL 33434, at *2 ("[T]he SEC's burden of proof on an asset freeze is not as onerous as its burden would be for an injunction."). "A freeze is particularly warranted where" – as here – "the defendant's alleged conduct involves fraud." SEC v. Credit Bancorp Ltd., No. 99 Civ. 11395, 2010 WL 768944, at *3 (S.D.N.Y. Mar. 8, 2010).

Upon making the required showing, the SEC is entitled to a freeze of assets "sufficient to preserve its disgorgement remedy as well as assets necessary to pay civil monetary penalties." SEC v. Maillard, No. 13–cv–5299 (VEC), 2014 WL 1660024, at *4 (S.D.N.Y. April 23, 2014).

Because Congress has authorized a civil penalty equal to three times the profits of insider trading, it is appropriate for the Court to freeze funds sufficient to pay both the disgorgement and three-time penalty amount that may eventually be due. See id.; SEC v. Compania Internacional Financeira S.A., No. 11 Civ. 4904 (DLC), 2011 WL 3251813, at *12 (S.D.N.Y July 29, 2011).

    B.    There is Strong Circumstantial Evidence of Insider Trading, Supporting an Asset Freeze.

"[I]nsider trading is a type of securities fraud proscribed by Section 10(b) and Rule 10b–5." United States v. Newman, 773 F.3d 438, 445 (2d Cir. 2014). A person is liable under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder for illegal insider trading when he obtains material,[3] nonpublic information intended to be used only for a proper purpose and then misappropriates or otherwise misuses that information in breach of a fiduciary duty, or other duty arising out of a relationship of trust and confidence, to make "secret profits" by trading or tipping others. Dirks v. SEC, 463 U.S. 646, 654 (1983). Recently, in Newman, the Second Circuit described the elements of classical insider trading against a tippee as follows:

> (1) the corporate insider was entrusted with a fiduciary duty; (2) the corporate insider breached his fiduciary duty by (a) disclosing confidential information to a tippee (b) in exchange for a personal benefit; (3) the tippee knew of the tipper's breach, that is, he knew the information was confidential and divulged for personal benefit; and (4) the tippee still used that information to trade in a security or tip another individual for personal benefit.

Newman, 773 F.3d at 450. "An alternative, but overlapping, theory of insider trading liability, commonly called the 'misappropriation' theory, expands the scope of insider trading liability to certain other 'outsiders,' who do not have any fiduciary or other relationship to a corporation or

---

[3] Nonpublic information about an acquisition is plainly material, especially in light of a stock price increase once the information becomes public. See, e.g., SEC v. Obus, 693 F.3d 276, 290 n.3 (2d Cir. 2012) ("Unannounced acquisitions are a prototypical example of material non-public information."); SEC v. Warde, 151 F.3d 42, 47 (2d Cir. 1998) (holding that materiality was "confirmed by the fact that the stock price jumped when [the] information was made public").

- 7 -

its shareholders." Id. at 445. "Liability may attach where an 'outsider' possesses material non-public information about a corporation and another person uses that information to trade in breach of a duty owed to the owner."[4] Id. at 445-46 (citing U.S. v. O'Hagan, 521 U.S. 642, 652–53 (1997)); U.S. v. Libera, 989 F.2d 596, 599–600 (2d Cir. 1993)).

"Proof of insider trading can well be made through an inference from circumstantial evidence and not solely upon a direct testimonial confession." SEC v. Singer, 786 F. Supp. 1158, 1164 (S.D.N.Y. 1992); see also SEC v. Roazak, 495 F. Supp. 2d 875, 887-89 (N.D. Ill. 2007) (collecting cases holding that "the SEC is entitled to prove its case through circumstantial evidence.").

Defendant's trading was highly suspicious and unusual. A trade is "unusual," if made "in amounts dramatically out of line with prior trading practices and at times calculated to maximize personal benefit from undisclosed inside information." In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009) (quotation omitted). The inquiry is highly context-specific. Russo v. Bruce, 777 F. Supp. 2d 505, 517 (S.D.N.Y.2011).

Here, Luo's trading was highly unusual and suspicious for at least the following reasons:

a. Luo opened his account at Credit Suisse shortly before the announcement;
b. The only securities transaction in the Credit Suisse account was his purchase of Qihoo options;
c. Luo's Qihoo options were short-term and the strike price for many of the options was significantly higher than the trading price for the stock on the purchase date;
d. The price that Luo paid for the options was significantly higher than his annual salary;

---

[4] At this time, it is unclear whether Defendant misappropriated material nonpublic information or were tipped. Luo does not appear to be an insider of any of the entities involved in the buyout offer, although that is uncertain.

e. Luo is the CEO of a competitor of Qihoo. It would be highly unusual for a CEO to make such a purchase of a competitor's stock;

f. Luo had contact with individuals from Qihoo, including presenting at conferences with the Qihoo employees

g. Luo did not sell the options prior to the announcement of the buyout offer when his options were all in the money. Rather, he waited after until the announcement to sell; and

a. Luo's trading resulted in profits of at least $832,550.

Courts routinely find an inference of insider trading when such unusual and suspicious trading is present. See, e.g., SEC v. Compania Internacional Financiera S.A., No. 11 Civ. 4904, 2011 WL 3251813, at *8-*13 (S.D.N.Y. June 29, 2011) (granting asset freeze based on circumstantial evidence of suspicious trades suggestive of insider trading: "on its own, [defendant]'s suspicious trading activity provides an inference of insider trading without any assumption that [his] activities were coordinated with or connected to the trading by [co-defendants]."); SEC v. Musella, 748 F. Supp. 1028, 1039 (S.D.N.Y. 1989) (concluding defendant's "unusually large" trade suggested a confidence in the investment that supported inference of insider trading). Courts have found that an "allegation that defendant 'possessed material non-public information' was 'confirmed by [his] unusual timing and volume of trading.'" SEC v. Steffes, 805 F. Supp. 2d 601, 612 (N.D. Ill. 2011) (quoting SEC v. Suman, 684 F. Supp. 2d. 378, 388 (S.D.N.Y. 2010)).

It is not necessary to identify any specific tipper or tip to support an inference of insider trading. For instance, in SEC v. One or More Unknown Traders in Securities of Onyx, No. 13-CV-4645 (JPO), 2014 WL 5026153 (S.D.N.Y. Sept. 29, 2014), the court denied a motion to

dismiss and to dissolve an asset freeze, finding that "although the SEC has not alleged the identity of the tipper or the specific content of the tip, the overall circumstances of these two sets of trades, in conjunction with one another, make it plausible that [defendants] acted on an actual tip about Life and Onyx consisting of material nonpublic information." Id. at *7.

Similarly, in Unifund, the Second Circuit found that a freeze order was appropriate where there was a basis to infer insider trading but not sufficient evidence to prove all elements at the pre-trial stage, noting:

> There is a basis to infer that the appellants traded on inside information, and while the Commission is endeavoring to prove at trial the requisite element of trading in breach of a fiduciary duty of which the defendants were or should have been aware, the Commission should be able to preserve its opportunity to collect funds that may yet be ordered disgorged.

910 F.2d at 1041; accord Compania Internacional Financiera S.A., 2011 WL 3251813, at *8-*13 (issuing asset freeze in insider trading case with clear evidence of suspicious trading but unclear evidence of access to material nonpublic information).

Given the strong inference of insider trading presented by the evidence here, an asset freeze should enter.

### C. An Asset Freeze Order Should Enter Because of the Serious Risk that the Substantial Proceeds of the Trading Will Be Transferred Offshore.

An asset freeze is particularly appropriate here given the clear risk of imminent asset dissipation, especially considering Defendant's status as a foreign citizen. See, e.g., Gonzalez de Castilla, 145 F. Supp. 2d. 402, 420 (S.D.N.Y. 2001) (defendant's "status as a citizen and resident of Mexico with accounts at Mexican banks raises a danger that the funds would be dissipated or transferred beyond this Court's jurisdiction if his account did not remain frozen."); SEC v. Sonja Anticevic et al., No. 05 Civ. 6991(KMW), 2005 WL 1939946 (KMW) (S.D.N.Y. Aug. 5, 2005) (freezing the assets of a foreign citizen to avoid dissipation of assets); SEC v. Well Advantage

Ltd., et al., No. 12-cv-5786 (RJS), Docket Nos. 15, 35 (S.D.N.Y. Aug. 6 & 22, 2012) (freezing the assets of a foreign citizen to avoid dissipation of assets).

Here, the Commission has a compelling interesting in bringing civil actions to enforce the securities laws and collect on any obtained judgment. Given Defendant's status as a foreign citizen with what the Commission alleges to be ill-gotten gains in a United States financial account, there is significant risk that Defendant will wire his funds offshore and deny the Commission the ability to obtain effective relief.[5] This is not a hypothetical matter. Defendant Luo recently requested that $600,000 be wired from his account to an account in Singapore. (Murdocco Decl. at ¶ 30). Thus, the Court should enter an asset freeze.

## II. Expedited Discovery, Alternative Means of Service, and a Prohibition against the Destruction or Alteration of Documents is Necessary to Prepare for the Hearing on the Show Cause Hearing Requested by the Commission.

The Commission also requests that the Court set this matter for a hearing on an order to show cause prior to the expiration of the requested asset freeze. To allow it to prepare for that hearing, the Commission requests that the Court order expedited discovery. See Sonja Anticevic, 2005 WL 1939946 (ordering expedited discovery in connection with an asset freeze and order to show cause to a foreign defendant).

The Commission also requests that the Court permit alternative means of service, specifically, service by e-mail. Alternative service by e-mail on a foreign citizen is appropriate when the Commission obtains an order to show cause and an asset freeze. See SEC v. Babikian,

---

[5] The transactional aspects of securities fraud establish personal jurisdiction over a foreign defendant. See Kairalla v. Advanced Medical Optics, Inc., No. CV 07-05569, 2008 WL 2879087, at *15 (C.D. Cal. June 6, 2008) (holding that personal jurisdiction lies over German defendant in securities fraud case where plaintiff alleged that the defendant "trades in the United States securities markets, purposefully availing himself of the protections and privileges of the United States. . . ."); Howard v. Everex Systems, Inc., 228 F.3d 1057, 1068 (9th Cir. 2000) ("[a] defendant who is alleged to have knowingly traded on an American exchange on the basis of inside information has purposefully availed himself of the instrumentalities of United States commerce and can reasonably expect to be hauled into an American court"); SEC v. Euro Sec. Fund, No. 98 civ 7347 (DLC), 1999 WL 76801, at *3 (S.D.N.Y. Feb. 17, 1999) (finding personal jurisdiction in an insider trading case where foreign nationals traded a foreign company listed on the New York Stock Exchange).

No. 14 Civ. 1740(PAC), 2014 WL 2069348, at *1 (S.D.N.Y. April 21, 2014) (granting an order to show cause, asset freeze, and service by e-mail on a foreign citizen for alleged securities laws violations). Federal Rule of Civil Procedure 4(f)(3) allows service on an individual in a foreign country "by other means not prohibited by international agreement, as the court orders." "Service of process under Rule 4(f)(3) is neither a last resort nor extraordinary relief. It is merely one means among several which enables service of process on an international defendant." Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria, 265 F.R.D. 106, 115 (S.D.N.Y. 2010) (citation omitted). "The decision of whether to order service of process under Rule 4(f)(3) is 'committed to the sound discretion of the district court.'" United States v. Lebanese Canadian Bank, 285 F.R.D. 262, 266 (S.D.N.Y. 2012) (quoting Madu, 265 F.R.D. at 115). Further, a "plaintiff is not required to attempt service through the other provisions of Rule 4(f) before the Court may order service pursuant to Rule 4(f)(3) . . ." F.T.C. v. Pecon Software Ltd., No. 12 Civ. 7186 (PAE), 2013 WL 4016272, at *4 (S.D.N.Y. Aug. 7, 2013). Courts have found that alternative service is appropriate where traditional service under the Hague Convention would take numerous months. See In GLG Life Tech Corp. Securities Litigation, 287 F.R.D. 262, 266-67 (S.D.N.Y. 2012) (stating that "the Court is concerned that the length of time required for service [in China] under the Hague Convention [would be] approximately six to eight months. . . .) (collecting cases); see also Rio Props., Inc. v. Rio Int'l Interlink, 284 F.3d 1007, 1015 (9th Cir. 2002) ("[T]he advisory notes [to Rule 4] suggest that in cases of 'urgency,' Rule 4(f)(3) may allow the district court to order a 'special method of service,' even if other methods remain incomplete or unattempted.").

Courts have found that e-mail service in China is appropriate: "[v]arious courts have agreed that service by email is not prohibited by the Hague Convention. Email service has been

approved even where, as [in China], the country objects to Article 10 of the Hague Convention." Lexmark Intern., Inc. v. Ink Technologies Printer Supplies, LLC, 295 F.R.D. 259, 261-62 (S.D. Ohio 2013) (collecting cases). The core consideration under Rule 4(f) is whether service is "reasonably calculated to give notice" to Defendants. Fed. R. Civ. P. 4(f). Here, service by e-mail is reasonably calculated to reach Defendant because Luo included an e-mail address with his brokerage account application.

Finally, in order to protect all documents and other evidence necessary for full discovery in this action, the Commission seeks an order prohibiting the alteration or destruction of documents and other information related to the allegations of the Complaint or to the Defendant's assets, finances or business operations. Such orders are routinely granted to protect the integrity of the litigation. See Unifund SAL, 910 F.2d at 1040 n.11 (upholding an order prohibiting the alteration or destruction of documents).

## CONCLUSION

For all of the foregoing reasons, the Commission requests that this application be granted.

Dated: June 23, 2015

/s/ Todd D. Brody
Todd D. Brody
Senior Trial Counsel

Andrew M. Calamari
Sanjay Wadhwa
Wendy Tepperman
Melanie MacLean
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Brookfield Place, 200 Vesey Street
New York, NY 10281
(212) 336-0080
brodyt@sec.gov
teppermanw@sec.gov
macleanm@sec.gov